573 P.2d 69

M. J. EVERTSEN, Mason Contractor,
and Continental Casualty
Company, Petitioners,

v.

The INDUSTRIAL COMMISSION of
Arizona, Respondent,

Leo E. Harwood, Respondent Employee.

No. 1 CA–IC 1613.

Court of Appeals of Arizona,
Division 1,
Department C.

Oct. 4, 1977.

Jennings, Strouss & Salmon by Steven C. Lester, Phoenix, for petitioners.

John H. Budd, Jr., Chief Counsel by Linda J. Norton, Phoenix, for respondent.

OPINION

JACOBSON, Presiding Judge.

This Special Action—Industrial Commission review presents two issues:

(1) The standing of the Industrial Commission to file briefs before this court for unrepresented claimants, and

(2) On the merits, the propriety of the hearing officer's determination of loss of earning capacity.

These issues arose out of a Petition for Special Action—Industrial Commission, filed on September 7, 1976 by M. J. Evertsen, Mason Contractor and Continental Casualty Company, to review a decision of a Commission hearing officer, finding that the respondent employee, Leo E. Harwood, had sustained a 29.22% reduction in his earning capacity and was entitled to com-

pensation benefits of $99.91 per month. Apparently Mr. Harwood was unrepresented by counsel before the Commission.

On October 18, 1976, the petitioners filed their opening brief. Prior to that date, on September 14, 1976, the Industrial Commission filed a Notice of Appearance. No notice of appearance or briefs have been filed by the claimant, Mr. Harwood. However, on December 7, 1976, the Industrial Commission, through its chief counsel, filed an "Answering Brief of Respondent The Industrial Commission of Arizona." This answering brief dealt solely with the merits of petitioners' attack upon the particular Findings and Award of the Commission's hearing officer.

On February 15, 1977, the petitioners filed a "Motion to Vacate Award for Failure to File Answering Brief." By this motion, the petitioners attacked the standing of the Commission to file an answering brief defending its own Findings and Award.[1] The Commission has responded to this motion. By order of this court, we took petitioners' motions under advisement and requested counsel at time of oral argument to address themselves to the matters raised by these motions. Before setting forth the factual background on the merits of this review, we will deal with petitioners' Motion to Vacate and the standing of the Commission to appear on behalf of non-appearing prevailing parties before the Commission.

The petitioners' position may be summarized as:

(1) That the claimant, Mr. Harwood, whose award is under attack, has neither filed an appearance or answering brief in this court and since justiciable issues were raised as to the validity of that award, under the doctrine of *City Van Storage v. Industrial Commission*, 23 Ariz.App. 551, 534 P.2d 765 (1975), such a failure constitutes a confession of reversible error.

(2) That the Commission has by filing its answering brief, which does not address itself to any issues of general administrative importance to the Commission, but rather merely seeks to defend the action of its hearing officer has assumed an adversary role in this matter.

(3) That by assuming an adversary position, the Commission has abandoned its position as an impartial arbitrator and thus its credibility as an impartial tribunal has been destroyed.

(4) That the Commission by filing such a brief has, in essence, undertaken representation of the claimant without authority to do so.

(5) That if the Commission is going to appear and advance positions of parties appearing before it, then any winning party would be advised to make no appearance and thus avoid the taxation costs under Rule 10(j), Rules of Procedure for Special Actions.

The Commission counters these contentions by arguing:

(1) That under the doctrine of separation of powers as an executive agency, it has the right and obligation to defend its executive actions.

(2) That because of the "confession of error" rule, policy requires that answering briefs be filed to avoid the setting aside of awards for "technical" reasons and the concomitant administrative time and expense in rehearing the matter.

(3) That unless the Commission is allowed to file briefs on behalf of unrepresented parties, "it will force all future unrepresented claimants to hire a lawyer or doom the taxpayer to incur the costs of many redundant hearings in the name of a technicality."

In order to place these arguments in perspective, a brief history of the Commission's handling of Workmen's Compensation is in order. Prior to 1969, the various functions

---

1. The petitioners also filed a motion to strike a portion of the Commission's answering brief dealing with alleged subjective mental calculations of the hearing officer. Since we deem this motion to be merely supportive of its motion to vacate the award, we deal no further with it.

of the compensation process, that is, the setting of premium rates, the issuing of compensation insurance, the responsibility for the soundness of the insurance fund, and the adjudicating of claims, were all combined under the authority of the Commission. Thus, the Commission was not only setting the rates that employers must pay for insurance, and administering the insurance fund for fiscal soundness, it was also determining what claims and what amounts would be collected from that fund. Because of the apparent conflict in these roles, the Arizona Supreme Court observed in *Allen v. Industrial Commission*, 87 Ariz. 56, 347 P.2d 710 (1959):

> "Nor do we consider the role of the Commission to be that strictly of an adversary at a proceeding in which it acts also in a judicial capacity, especially when the employee, as here, does not appear before it represented by counsel." *Id.* at 68, 347 P.2d at 718.

This attitude that the Commission operates in the capacity of *parens patriae*, is reflected, for example, in the holding of the Court of Appeals in *Lugar v. Industrial Commission*, 9 Ariz.App. 44, 449 P.2d 61 (1968):

> "The intention of the Workmen's Compensation Act was to provide benefits for workmen injured in the course and scope of their employment, and to do so by a relatively informal administrative procedure which would be less cumbersome and time consuming than formal court action.
>
> \*  \*  \*  \*  \*  \*
>
> "We see nothing to be gained by the Commission by indulging in picayune procedural tactics designed to frustrate petitioner's claim." *Id.* at 49, 449 P.2d at 66.

Against this backdrop, the sweeping changes affecting Workmen's Compensation were enacted in 1968, effective January 1, 1969. These legislative changes were major in three respects pertinent here. (1) They removed the Workmen's Compensation insurance function from the Commission and placed it under the direction and control of the State Compensation Fund administered by a separate board of directors. A.R.S. §§ 23–981, 23–981.01, and 23–982; (2) they made competitive the carrying of workmen's compensation insurance by private insurance carriers. A.R.S. § 23–1001; and, (3) the initial administration of claims passed from the Commission to the insurance carrier. A.R.S. § 23–1061(G).

▮ The effect of these three major changes were, in our opinion, twofold in nature. (1) The Commission was removed from the role of both defending against an applicant's claim as keeper of the insurance fund and being an arbiter of the validity of that claim.[2] Thus, the Commission truly became an impartial agency for the determination of claims arising under the Workmen's Compensation Act.[3] (2) Contested proceedings before the Commission assumed an adversary posture. On one side was the claimant protesting a prior determination of the insurance carrier and on the other side was the insurance carrier defending that prior determination.

With this background in mind, we now turn to the various contentions of the parties. The Commission first argues that it has an absolute right, being an administrative agency, to defend the decisions of that agency whenever they come under attack in a judicial proceeding. The Commission has cited no statutes or case authority in support of this position. In fact, a review of the statutory history of the Commission's right to appear in this court on review of an

---

2. There are exceptions to this, for example, the Commission still administers the special fund, which will be touched on later in this opinion.

3. The 1968 amendments placed responsibility for initial hearings for the determination of claims in the hearing officer division with a right to appeal to the Commission members themselves. 1968 Ariz.Sess.Laws, 4th S.S., ch. 6, § 17. Subsequent amendments took this reviewing function away from the Commissioners and placed it in the presiding hearing officer. A.R.S. § 23–943.

award,[4] could lead to the opposite conclusion—that the Commission has no right to appear before this court, other than in its capacity to certify and transmit its records, proceedings and evidence.

A.R.S. § 23–951(C), as originally enacted, provided that, *"The commission* and each party to the action or proceeding before the commission shall have the right to appear in the review proceeding"[5] (emphasis added) on a review by writ of certiorari of an award of the Commission. This was in keeping with the Commission's role as the defender of claims against the insurance fund. However, in 1968, the legislature amended subsection (C) of A.R.S. § 23–951 to provide: *"Each party to the proceeding* before the commission may appear in the court of appeals."* (emphasis added) thus deleting the Commission's authority to appear. Again, this was in keeping with the amendments which removed the Commission as an active party litigant in the compensation process. From simply the standpoint of statutory history, it could be concluded that the Commission has no authority to appear before this court in regard to a review of an award of a hearing officer.

However, like the Commission's assertion that it has an absolute right to appear, the conclusion that the Commission may never appear before this court is likewise too broad in its application. In our opinion, the correct interpretation of this legislative history[6] is that when we are reviewing an award of a hearing officer, the Commission should only appear before this court as an advocate in those cases where it has a legitimate interest to defend.

As we stated in an unpublished order of this court, denying a motion for rehearing filed by the Commission in the case of *St. Luke's Hospital v. Industrial Commission,* 114 Ariz. 118, 559 P.2d 674, 678:

" . . . [T]he court is aware that on occasion, because of legal positions assumed by the parties appearing before the Commission, the Industrial Commission has a legitimate interest in appearing as an advocate in this court to defend the integrity of the Special Fund, to defend the Commission's procedures and to assist the Court in reaching a correct result where matters involving the general interest of the Commission in carrying out its statutory authority or policies are concerned."

■ We therefore hold that the Commission has no absolute authority or duty to appear before this court when reviewing the award of a hearing officer, but that its authority or duty to appear is limited to those instances where, as an advocate, it has a legitimate interest to propose or defend. In this regard, we note that the defense of a hearing officer's decisions, findings and award, insofar as the Commission is concerned, lies in the reasoning of the award itself.

We now turn to the Commission's contention that its "legitimate interest" here is to avoid the setting aside of an award on the "technical" grounds of non-appearance and the resulting time and expense involved in rehearing the matter. We first note that the problem raised by the Commission is not the result of a judicial confession of error rule, but the inability of this court (or the Supreme Court) to set aside an award with specific directions to the Commission to enter a specific award, thus avoiding the rehearing *de novo.* Also, the Commission's position unwarrantably assumes that on rehearing the exact same award will result as was reviewed, and thus, the "technical" set aside is of no effect.

---

4. An "award" is defined in A.R.S. § 23–901(1) as "the finding or decision of a hearing officer or the commission as to the amount of compensation or benefit due an injured employee or the dependents of a deceased employee." See A.R.S. § 23–946 for the right of the Commission to appear in judicial proceedings concerning an "order" of the Commission.

5. 1925 Ariz.Sess.Laws, ch. 83, § 90(c).

6. While Rule 10, Rules of Procedure for Special Actions, deals with appearances before this court, this rule is not enlightening as to the adversary role of the Commission before this court.

We also question the validity of the policy decision involved in the position that it is necessary for the Commission to make an appearance before this court to avoid the confession of error rule. If nondiscriminatorily exercised, this position would encourage prevailing parties to allow the Commission to carry the burden and expense of the appeal. Once it became general knowledge that the Commission was going to defend its hearing officer's decisions on review, the Commission, in all probability, would appear in court on behalf of the winning party in every review filed. Based upon a review of the last 100 Petitions for Special Action—Industrial Commission filed in this court, this would mean that 70% of the time the Commission would be defending awards in favor of insurance carriers. The increase in the Commission's workload would necessitate an increase in staff counsel with resulting expenses to be borne by taxpayers. This potential shift of costs from the private to the public sector argues against the "policy" reasons given by the Commission to justify its appearance in this court whenever the winning party makes no appearance.

■■■ Finally, and most importantly, the appearance of the Commission before this court in an adversary posture on behalf of the litigant which appeared before it, completely destroys the impartial character of the Commission as a tribunal where justice to both claimants and carriers should be meted out on an even-handed basis. While we of the judiciary have come to view the function of an Industrial Commission hearing officer in the same light as a superior court judge, Chief Counsel for the Commission is correct in asserting that such hearing officers are not judicial officers, but part of the executive branch of government. However, even as an administrative agency of the executive department, due process requires that all parties appearing before it receive a "fair and impartial decision." A.R.S. § 23–941. See *Jenners v. Industrial Commission*, 16 Ariz.App. 81, 491 P.2d 31 (1971); *Jones v. Industrial Commission*, 1 Ariz.App. 218, 401 P.2d 172 (1965).

What is "fair and impartial," like beauty, is mainly in the eyes of the beholder. Thus, if an adjudicatory tribunal "appears" to be favoring one side or the other regardless of the justness of its decisions, the losing party is going to assume that the decision is biased. The result is that not only is the decisional process of the tribunal brought into disrepute, the reviews of that tribunal naturally increase, burdening the entire system. In short, like Caesar's wife, an adjudicating tribunal must avoid even the appearance of impropriety in dealing with adverse interests appearing before it. This is no less true of the Industrial Commission as an executive body than it is of a superior court as a judicial body.

■■■ Having made these observations, this court is certainly aware that the final decision of when the Commission will appear as an advocate before this court when we are reviewing an award of the Commission, lies within the sound discretion of the Commission. However, we find that in this case the Commission has no "legitimate interest" to defend, as we have defined that term, and therefore must conclude that the Commission's filing of an answering brief in this matter was an abuse of discretion.

■ Having reached this conclusion, we would normally grant petitioners' motion to vacate the award before us and remand the matter to the Commission for further proceedings *de novo*. However, the confession of error rule is not absolute and can be waived in the discretion of this court. *Arizona Corporation Commission v. Construction Trucking Service*, 13 Ariz.App. 22, 24, 473 P.2d 824, 826 (1970); *Ghyselinck v. Buchanan*, 13 Ariz.App. 125, 126, 474 P.2d 844, 845 (1970). We deem such a waiver appropriate here and therefore reach the merits of petitioners' review and in doing so, set out additional facts.

On February 10, 1970, while employed as a bricklayer, Mr. Harwood sustained a multiple injury industrial accident. His average monthly wage was established at $621.56, based upon wages of $7,458.72 over a 12-month period.

Effective May 1, 1973, Mr. Harwood was placed on temporary partial compensation upon his returning to his pre-injury occupation. Between May, 1973 and December, 1973, Mr. Harwood earned approximately $8,000.00. In 1974, Mr. Harwood continued to work as a bricklayer and earned approximately $14,000.00. Apparently the work following his injury was all conducted in the area of Salt Lake City, Utah, where he had been employed prior to his injury in Arizona. He was found to be medically stationary as of June 14, 1974 with a 30% general physical functional disability. Subsequently, on August 21, 1975, the Commission issued an award finding that Mr. Harwood has suffered a permanent physical disability as a result of the industrial injury, but that he had sustained no loss of earning capacity. This award was timely protested by a request for hearing.

At the time of hearing, the evidence presented by Mr. Harwood established that as a result of his 30% physical disability, his ability to perform as a brick mason was impaired, particularly in the type of masonry units he could handle, the type of weather he could work in, and the position he had to assume to perform his work. However, with these impairments, Mr. Harwood was able to earn $14,000.00 during 1974. Normally, post-injury earnings are a valid indicator of loss of earning capacity. A.R.S. § 23–1044(D). *See Continental Casualty Company v. Industrial Commission,* 21 Ariz. App. 561, 563, 521 P.2d 1019, 1021 (1974); *Corr v. Industrial Commission,* 16 Ariz.App. 12, 14–16, 490 P.2d 841, 843–844 (1971). The hearing officer recognized this by specifically finding that Mr. Harwood sustained no loss of earning capacity during 1974.

The hearing officer did find that Mr. Harwood's demonstrated loss of earning capacity was effective January 1, 1975, (in the amount of 29.22%), presumably based upon earnings in 1975 of only $8,600.00. Petitioners point out that while a diminution of

earnings was experienced in 1975 and the first five months of 1976, there was no showing that this diminution was related to the industrial physical impairment. In particular, petitioners contend that the drop in earnings experienced in 1975 and 1976 were related to economic and other conditions. In this regard, Mr. Harwood testified:

"Now the next—in '75, I dropped down between one thing and another to $8600 I believe it was.

"And this year it has been about 50% employment I imagine. Now, I can't say that that is due to the—entirely to the accident. That is neither here nor there. There is conditions, the economy and what people is doing and the type of construction they are in mostly now which has a great deal of baring [sic] on that.

"But if I was completely physically sound, my chances of going out and competing on the market where the units has got away from residential and went into industrial and your workers went that way, which involves a lot of grouting and stuff, that I just haven't attempted or wouldn't attempt.

\* \* \* \* \* \*

"In other words, I might go out a season here and a season there if the work is right and the right type and make just as much as the next fellow. But if it isn't the type of work I can handle or the conditions I can handle, then I am just going to be out of a job. That is all it amounts to."

■ Contrary to petitioners' contention that this testimony conclusively shows that Mr. Harwood's drop in earnings was related to economic conditions, it merely shows that when the economics of the construction industry force a change in the type of work being performed, Mr. Harwood's industrially related physical impairment prevents him from effectively competing in that market.[7] In our opinion, this is sufficient for a *prima facie* showing of loss of earning capacity.

7. Petitioners also argue that the weather in Salt Lake City, Utah, where Mr. Harwood was working might also be a factor in the drop in

1975 earnings. However, the 1974 wages were also earned in Salt Lake City.

A different problem arises when we attempt to ascertain the amount of that loss of earning capacity. It has been stated on numerous occasions that mathematical exactness in determining loss of earning capacity is a difficult task, especially where the loss is only partial in nature, because of the inconclusive nature of the evidence from which an evaluation must be made. *Talley v. Industrial Commission*, 105 Ariz. 162, 165, 461 P.2d 83, 86 (1969); *Davis v. Industrial Commission*, 82 Ariz. 173, 175, 309 P.2d 793, 795 (1957); *Hoffman v. Brophy*, 61 Ariz. 307, 311, 149 P.2d 160, 161 (1944); *Magma Copper Co. v. Industrial Commission*, 15 Ariz.App. 279, 282, 488 P.2d 484, 487 (1971).

However, merely because the task is difficult does not mean that loss of earning capacity may be based solely on conjecture. It appears that the hearing officer utilized an hourly rate established in 1976 to determine the number of hours worked in 1975, by dividing that rate into the 1975 earnings. There is no showing that the earnings received in 1975 were at the same hourly rate as 1976.[8] In this, the hearing officer erred. If the 1975 wages are to be used to determine what "part time" masons are earning, (the hearing officer classified Mr. Harwood as being able to perform "part-time" work, a classification with which we agree) then the hourly rate prevailing in 1975 must be utilized.

In our opinion, the hearing officer did not err in determining that Mr. Harwood suffered a loss of earning capacity, but improperly arrived at the amount of that loss. For this reason alone, the award must be set aside.

DONOFRIO and OGG, JJ., concur.

---

8. Petitioners also contend the hearing officer improperly utilized an hourly rate established in Utah to determine an Arizona loss of earning capacity. The evidence shows, however, that the hourly rate for masons in Arizona and in Utah were substantially similar.